No. 25-5137

UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

CENTER FOR BIOLOGICAL DIVERSITY, et al.,
*Plaintiffs/Appellants,*

v.

UNITED STATES BUREAU OF RECLAMATION, et al.,
*Defendants/Appellees.*

Appeal from the United States District Court for the Eastern District of
California
No. 1:20-CV-00706 (Hon. Jennifer L. Thurston)

**APPELLEES' ANSWERING BRIEF**

ADAM R.F. GUSTAFSON
*Principal Deputy Assistant Attorney General*

ROBERT P. STOCKMAN
DAVID W. GEHLERT
JEFFREY N. CANDRIAN
ANGELA N. ELLIS
*Attorneys*
Environment and Natural Resources
Division
U.S. Department of Justice
Post Office Box 7415
Washington, D.C. 20044
(202) 598-7942
angela.ellis@usdoj.gov

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................ iv

GLOSSARY .................................................................................... ix

INTRODUCTION ............................................................................. 1

STATEMENT OF JURISDICTION .................................................... 3

STATEMENT OF THE ISSUES ........................................................ 4

PERTINENT STATUTES AND REGULATIONS ................................. 4

STATEMENT OF THE CASE ............................................................ 5

    A.    Statutory and regulatory background.................................... 5

        1.    The National Environmental Policy Act........................ 5

        2.    The Endangered Species Act ........................................ 7

        3.    Reclamation law governing contracts ........................... 8

        4.    The Central Valley Project Improvement Act ................................................................................ 10

        5.    The Water Infrastructure Improvements for the Nation Act ............................................................ 11

    B.    Factual background ............................................................ 14

        1.    The Central Valley Project .......................................... 14

        2.    Reclamation's environmental review and ESA consultation related to the Central Valley Project ............................................................... 16

i

3. Conversion of the contracts .......................................... 19

C. Proceedings below ................................................... 20

SUMMARY OF ARGUMENT ................................................. 23

STANDARD OF REVIEW .................................................... 27

ARGUMENT ............................................................... 28

I. The WIIN Act imposes a nondiscretionary obligation on Reclamation to convert water service contracts "upon request." ................................................................ 28

   A. Section 4011 creates a mandatory duty and limits Reclamation's discretion to negotiating financial terms of repayment. ............................................... 29

   B. Reclamation's conversion of water service contracts under Section 4011 is not a major federal action that requires NEPA review ........................... 32

   C. Reclamation's nondiscretionary conversion of water service contracts also does not trigger an obligation to consult under the ESA. ................................... 42

   D. The WIIN Act's savings clauses do not require NEPA review or ESA consultation for conversion of water service contracts. .................................... 47

      1. Section 4012(a)(2) ......................................... 48

      2. Sections 4012(a)(3) and (4) ............................ 53

      3. Section 4011(d)(4) ......................................... 55

   E. Plaintiffs' citation to the WIIN Act signing statement is also unavailing ................................. 55

ii

II.  Plaintiffs' reliance on the canon against implied repeals is misplaced. .......................................................... 58

III.  Plaintiffs' arguments based on the prior water service contracts fail. ................................................................. 61

CONCLUSION ...................................................................................... 67

CERTIFICATE OF COMPLIANCE

ADDENDUM

iii

# TABLE OF AUTHORITIES

**Cases**

*350 Montana v. Haaland,*
　　50 F.4th 1254 (9th Cir. 2022)..........................................................67

*Alaska Wilderness League v. Jewell,*
　　788 F.3d 1212 (9th Cir. 2015) ...............................................33, 37

*Aluminum Co. of Am. v. Central Lincoln Peoples' Utility*
　　*Dist.,* 467 U.S. 380 (1984) ...............................................................41

*Appalachian Voices v. FERC,*
　　139 F.4th 903 (D.C. Cir. 2025)............................................................6

*Bartenwerfer v. Buckley,*
　　598 U.S. 69 (2023) .............................................................................29

*Central Delta Water Agency v. Bureau of Reclamation,*
　　452 F.3d 1021 (9th Cir. 2006) ..........................................................14

*Dep't of Transp. v. Pub. Citizen,*
　　541 U.S. 752 (2004) ............................................................................6

*Envtl. Prot. Info. Ctr. v. Simpson Timber Co.,*
　　255 F.3d 1073 (9th Cir. 2001) ..........................................................42

*Grand Canyon Tr. v. U.S. Bureau of Reclamation,*
　　691 F.3d 1008 (9th Cir. 2012) ....................................................8, 42

*Grant Cnty. Black Sands Irrigation Dist. v. U.S. Bureau of*
　　*Reclamation,* 579 F.3d 1345 (Fed. Cir. 2009)..................................9

*Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach,*
　　523 U.S. 26 (1998) .............................................................................30

*Loper Bright Enterprises v. Raimondo,*
　　603 U.S. 369 (2024) ...........................................................................28

iv

*Nat'l Ass'n of Home Builders v. Defs. of Wildlife,*
    551 U.S. 644 (2007) ................................. 7, 25, 31, 42, 44, 58, 59, 60

*Natural Res. Def. Council v. Haaland,*
    102 F.4th 1045 (9th Cir. 2024)......................... 15, 16, 27, 47, 64, 65

*Natural Resources Defense Council v. Houston,*
    146 F.3d 1118 (9th Cir. 1998) ............................................ 45, 46, 47

*Natural Resources Defense Council v. Jewell,*
    749 F.3d 776 (9th Cir. 2014) ....................................................... 47

*Nw. Ecosystem All. v. U.S. Fish & Wildlife Serv.,*
    475 F.3d 1136 (9th Cir. 2007) ..................................................... 28

*Pac. Coast Fed'n of Fishermen's Assoc. v. U.S. Dep't of the*
    *Interior,* 929 F. Supp. 2d 1039 (E.D. Cal. 2013).............................. 53

*Peterson v. Dep't. of Interior,*
    899 F.2d 799 (9th Cir. 1990) ..................................................... 8, 9

*Roberts v. Sea-Land Servs., Inc.,*
    566 U.S. 93 (2012) ................................................................... 39

*Robertson v. Methow Valley Citizens Council,*
    490 U.S. 332 (1989) ................................................................... 5

*Seven Cnty. Infrastructure Coal. v. Eagle Cnty.,*
    605 U.S. 168 (2025) ..................................................... 5, 6, 32, 33

*Sierra Club v. Babbitt,*
    65 F.3d 1502 (9th Cir. 1995) ....................................................... 33

*Sturgeon v. Frost,*
    577 U.S. 424 (2016) ................................................................... 38

*Turtle Island Restoration Network v. Nat'l Marine Fisheries*
    *Serv.,*
    340 F.3d 969 (9th Cir. 2003) ........................................................ 8

*United States v. Harrell,*
 637 F.3d 1008 (9th Cir. 2011) ................................................. 28, 29

*Westlands Water Dist. v. U.S. Dep't of the Interior,*
 376 F.3d 853 (9th Cir. 2004) ................................................... 27, 28

*Yakima Valley Mem'l Hosp. v. Washington State Dep't of*
 *Health,* 654 F.3d 919 (9th Cir. 2011) ............................................ 56

**Statutes**

*Administrative Procedure Act,* 5 U.S.C. §§ 701-06 ................................... 3

 5 U.S.C. § 706(2)(A) ............................................................ 28

*Endangered Species Act,* 16 U.S.C. 1531 ............................................ 53

 16 U.S.C. § 1531(b) ............................................................. 7

 16 U.S.C. § 1536(a) ........................................................... 7, 8

 16 U.S.C. § 1536(b) ............................................................. 8

*National Envirpnmental Policy Act,* 42 U.S.C. § 4332(2)(C) ...... , 5, 25, 34

 42 U.S.C. § 4336(a) .......................................................... 7, 35, 36

 42 U.S.C. § 4336e(10)(A) ....................................................... 6, 34

 42 U.S.C. § 4336e(10)(B)(vii) .................................. 6, 25, 34, 37, 58

 42 U.S.C. § 4336e(12) ......................................................... 34, 58

*Reclamation Act of 1902, codified and amended at* 43 U.S.C.
§§ 371-600e ................................................................... 8

*Omnibus Act of 1902*, 43 U.S.C. § 423e ................................................... 9

*Reclamaion Project Act of 1939 (1939 Act)*, 43 U.S.C. § 485h ................. 9

43 U.S.C. § 485h-1 ................................................ 45, 50, 51

43 U.S.C. § 485h(e) ................................................ 15, 45

*Reclamation Reform Act,* Pub. L. No. 97-293, 96 Stat 1261
(1982) ...................................................................... 12

*Central Valley Improvement Act (CVPIA)*, Pub. L. No. 102-
575, § 3401 *et seq*., 106 Stat 1600 (1992)................................ 10, 48

§ 3404(c) ........................................................... 49, 51

§ 3404(c)(1)................................................... 11, 49, 51, 52

§ 3404(c)(2)................................................... 49, 52

§ 3409 ........................................................... 11, 18

*2016 Water InfrastructionImprovement for the Nation Act*
(*WINN* Act) Pub. L. No. 114-322, 130 Stat 1628 (2016) ................. 1

§ 4007(b)(4) .......................................................2, 11

§ 4007(c)(3).......................................................2, 11

§ 4007(h) .......................................................2, 11

§ 4010(a)(1) .......................................................2, 14

§ 4011(a).......................................................2, 11, 24

§ 4011(a)(1) ................................. 2, 12, 29, 30, 31, 35, 37, 38, 44, 46

§ 4011(a)(2) ...................................................... 11, 12, 13, 19, 32, 51

§ 4011(a)(3)(A) ....................................................................... 4419

§ 4011(a)(3)(C) ........................................................................... 13

§ 4011(a)(4) ............... 2, 13, 23, 30, 31, 32, 38, 39, 40, 41, 45, 46, 60

§ 4011(c)(1)................................................................................. 12

§ 4011(d)(4) ......................................................................... 54, 55

§ 4011(e)(2) ............................................................................... 12

§ 4011(f)(5) ................................................................................ 13

§ 4012(a)(2) ...................................................................... 13, 48, 52

§ 4012(a)(3) ...................................................................... 13, 53, 54

§ 4012(a)(4) ...................................................................... 14, 53, 54

*Fiscal Responsibility Act of 2023*, Pub. L. No. 118-5 § 111,
    137 Stat 10 (2023) ................................................................. 5, 33

28 U.S.C. § 1291........................................................................... 4

28 U.S.C. § 1331........................................................................... 3

## Regulations

50 C.F.R. § 402.03...................................................... 7, 8, 42, 44, 45, 58

50 C.F.R. § 402.14(h) ..................................................................... 8

# GLOSSARY

APA                 Administrative Procedure Act

CVP                Central Valley Project

CVPIA             Central Valley Project Improvement Act

ESA                Endangered Species Act

FWS                U.S. Fish and Wildlife Service

NEPA              National Environmental Policy Act

NMFS             National Marine Fisheries Service

WIIN Act        Water Infrastructure Improvements for the Nation Act

ix

**INTRODUCTION**

The Bureau of Reclamation operates the Central Valley Project (the "CVP"), the largest and one of the most important federal water management projects in the United States. Extending 400 miles through central California, the CVP supplies water for domestic and industrial uses, reduces flood risk, generates electricity, and provides water to restore and protect fish and wildlife. It delivers water to more than 250 long-term contractors who are responsible under reclamation law for repaying a portion of federal funds spent constructing, operating, and maintaining the project. Reclamation's long-term CVP operations are subject to extensive environmental review, including a programmatic environmental impact statement that Reclamation prepared under the National Environmental Policy Act ("NEPA") to assess the project's environmental effects and programmatic biological opinions on impacts to federally listed species and habitat under the Endangered Species Act ("ESA").

This case involves Reclamation's implementation of Section 4011 of the 2016 Water Infrastructure Improvements for the Nation Act ("WIIN Act"). Pub. L. No. 114-322, 130 Stat. 1628 (2016). In Section 4011,

1

Congress sought to fund water projects by incentivizing CVP contractors to convert existing "water service" contracts to "repayment" contracts. WIIN Act § 4011(a). Repayment contracts converted under Section 4011 allow contractors to prepay—in a lump sum or on an accelerated timeframe—Project-related construction debts that they otherwise would have paid to Reclamation over an extended period. *Id.* To facilitate contract conversions, Congress mandated that Reclamation "shall" convert existing water service contracts to allow for prepayment "upon request" of the contractor. *Id.* § 4011(a)(1). And Congress specified that the converted contracts "shall not modify other . . . contractual rights," including water service rights. *Id.* § 4011(a)(4)(C). Thus, the WIIN Act requires Reclamation to convert the financial terms of repayment but prohibits Reclamation from modifying other contract terms such as contracted water quantities or timing of water deliveries.

Plaintiffs claim that, before converting contracts under Section 4011, Reclamation should have undertaken NEPA review to consider the environmental effects of contract conversion. Plaintiffs also claim that Reclamation should have initiated consultation under Section 7 of the ESA to consider whether the contract conversion is likely to jeopardize

2

the continued existence of any listed species or adversely modify critical habitat.

But NEPA's environmental review requirements and the ESA's consultation obligations apply only to discretionary agency actions. Here, the WIIN Act imposed a nondiscretionary obligation on Reclamation to modify the financial terms of water service contracts by converting them into repayment contracts. Under these circumstances, NEPA does not require environmental review, and the ESA does not require consultation. The district court correctly concluded that, because Reclamation lacked discretion to deny requests to convert water service contracts or to negotiate additional protections for listed species, Reclamation did not need to prepare an environmental report or consult under the ESA. This Court should affirm.

## STATEMENT OF JURISDICTION

(a) The district court had subject matter jurisdiction under 28 U.S.C. § 1331 because Plaintiffs' claims arose under the National Environmental Policy Act, the Endangered Species Act, and the Administrative Procedure Act, 5 U.S.C. §§ 701-06. 1-ER-006.

3

(b) The district court's judgment was final because it disposed of all claims against all defendants. 1-ER-003-004. This Court has jurisdiction under 28 U.S.C. § 1291.

(c) The district court entered final judgment on July 15, 2025. 1-ER-003-004. Plaintiffs timely appealed on August 11, 2025, 27 days later. 3-ER-347-378. This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1. Whether Reclamation's conversion of water service contracts to repayment contracts under the WIIN Act was a major federal action that required environmental review under NEPA.

2. Whether Reclamation had discretion in converting water service contracts to repayment contracts under the WIIN Act that triggered the ESA's consultation obligation.

## PERTINENT STATUTES AND REGULATIONS

Except for the statutes and regulation set forth in the Addendum following this brief, all applicable statutes and regulations are contained in the Addendum to Plaintiffs' opening brief, Dkt. No. 36.2.

## STATEMENT OF THE CASE

### A. Statutory and regulatory background

### 1. The National Environmental Policy Act

NEPA establishes the process by which federal agencies must evaluate the environmental effects of certain proposed federal actions. *See Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*, 605 U.S. 168, 173 (2025). "NEPA is a *purely procedural statute.*" *Id.* at 180 (emphasis in original). The statute "'does not mandate particular results, but simply prescribes the necessary process' for an agency's environmental review of a project." *Id.* at 177 (quoting *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989)). Accordingly, "the central principle of judicial review in NEPA cases is deference." *Id.* at 179. At its core, NEPA requires that federal agencies prepare a "detailed statement" for "proposals for . . . major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C).

Congress amended NEPA in 2023. Fiscal Responsibility Act of 2023, Pub. L. No. 118-5, § 111, 137 Stat. 10, 45-46 (2023). These amendments codified many "basic principles that NEPA, correctly interpreted, already embodied but that have been too often overlooked,"

including what constitutes a major federal action. *Seven Cnty.*, 605 U.S. at 181 n.3; *see also Appalachian Voices v. FERC*, 139 F.4th 903, 927 (D.C. Cir. 2025) (Henderson, J., concurring) (observing that NEPA's 2023 amendments also superseded some NEPA precedent).

Under these amendments, a major federal action encompasses only those actions "that the agency carrying out such action determines is subject to substantial Federal control and responsibility." 42 U.S.C. § 4336e(10)(A). Under longstanding NEPA precedent, agencies did not need to consider environmental effects of nondiscretionary actions. *See, e.g., Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 770-71 (2004) ("[B]ecause [the agency] has no discretion to prevent the entry of Mexican trucks, its EA did not need to consider the environmental effects arising from the entry.").

NEPA's 2023 amendments codified that principle in multiple places. First, the definition of major federal action expressly "does not include" "activities or decisions that are non-discretionary and made in accordance with the agency's statutory authority." *Id.* § 4336e(10)(B)(vii). Second, actions that might otherwise trigger environmental review under NEPA do not require "an environmental document" if "the proposed

6

agency action is a nondiscretionary action with respect to which such agency does not have authority to take environmental factors into consideration in determining whether to take the proposed action." *Id.* § 4336(a)(4).

### 2.   The Endangered Species Act

The ESA contains both substantive and procedural requirements designed to achieve the goal of conserving endangered and threatened species and the ecosystems on which they depend. 16 U.S.C. § 1531(b). Plaintiffs' claims implicate Section 7 of the ESA. Under Section 7, federal agencies shall, "in consultation with" the relevant wildlife agency, ensure that actions they authorize, fund, or carry out are "not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification" of any designated critical habitat. 16 U.S.C. § 1536(a)(2).

This Section 7 duty does not apply when an agency lacks discretion over a proposed action. 50 C.F.R. § 402.03; *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 666 (2007). "[T]he ESA consultation requirement applies only if the agency has the discretionary control 'to inure to the benefit of a protected [listed] species.'" *Grand Canyon Tr. v.*

7

*U.S. Bureau of Reclamation*, 691 F.3d 1008, 1017-18 (9th Cir. 2012), *as amended* (Sept. 17, 2012) (quoting *Turtle Island Restoration Network v. Nat'l Marine Fisheries Serv.*, 340 F.3d 969, 977 (9th Cir. 2003)).

When Section 7 applies, the ESA and its implementing regulations provide a process for agencies proposing an agency action to consult with the National Marine Fisheries Service or the Fish and Wildlife Service, depending on the species. 16 U.S.C. § 1536(a); 50 C.F.R. pt. 402. At the conclusion of formal consultation, the consulting agency issues a biological opinion as to whether the proposed action is likely to jeopardize the continued existence of any listed species or result in the destruction or adverse modification of critical habitat. *Id.* § 1536(b); 50 C.F.R. § 402.14(h).

### 3. Reclamation law governing contracts

The Reclamation Act of 1902, codified as amended at 43 U.S.C. §§ 371-600e, established the use of contracts to provide the terms for both water delivery and project repayment. *Peterson v. Dep't. of Interior*, 899 F.2d 799, 803-04 (9th Cir. 1990) (recounting the evolution of contracting under reclamation law). Reclamation initially contracted directly with water users, but that changed when Congress enacted the Omnibus

8

Adjustment Act of 1926, 43 U.S.C. § 423e, which authorized Reclamation to contract with water user associations. *Id.* at 804.

Responding to the Great Depression's impact on water users' ability to meet their repayment obligations, Congress enacted the Reclamation Project Act of 1939 ("1939 Act"), codified as amended at 43 U.S.C. § 485h. *See generally Grant Cnty. Black Sands Irrigation Dist. v. U.S. Bureau of Reclamation*, 579 F.3d 1345, 1351-52 (Fed. Cir. 2009) (describing history of reclamation law); Order at 5-6. The goal of the 1939 Act "was to restructure [water users'] repayment obligations on the basis of ability to pay, while still protecting the federal government's financial investment in the reclamation projects." *Grant Cnty.*, 579 F.3d at 1351. The 1939 Act established the two most common forms of contract (and the only forms relevant to this case): the repayment contract and the water service contract.

Under Section 9(d) "repayment" contracts, water contractors receive project water in exchange for assuming an obligation to repay project-related construction costs in fixed annual installments over a predetermined period, in addition to their ongoing share of operation and maintenance expenses. *Id.* Each contractor's share of the costs to be

9

repaid is generally proportional to its share of the water supply. By contrast, Section 9(e) "water service" contracts are either short or long-term contracts for irrigation water delivery at an annual rate set by Reclamation. *Id.* at 1352. "The principal difference between 9(d) [repayment] and 9(e) [water service] contracts under the 1939 Act was that[,] under a 9(d) contract, the irrigation district or water users' association assumed an obligation to repay the construction costs of the project works in fixed annual installments over a predetermined period of time." *Id.* A 9(e) water service contract, by contrast, "was merely a contract to receive project water at an annual rate set by the Secretary." *Id.* Thus, "[t]he repayment contract is analogous to a mortgage, while a water service contract is more like a lease." *Id.* at 1354 (citation omitted).

### 4. The Central Valley Project Improvement Act

In 1992, Congress enacted the Central Valley Improvement Act ("CVPIA"), Pub. L. No. 102-575, § 3401 *et seq.*, 106 Stat. 4600, 4706-31 (1992). The CVPIA reauthorized the Central Valley Project and "formally added mitigation, protection, and restoration of fish and wildlife as co-equal project purposes." Order at 8. It also put limits on new contracts and existing contract renewal, including by reducing the maximum

10

length of a term contract that Reclamation could enter from 40 years to 25 years. *Id.* The CVPIA directed Reclamation to prepare a programmatic environmental impact statement within three years of the CVPIA's enactment and before further renewing CVP contracts. CVPIA §§ 3404(c)(1) & 3409. It required the programmatic environmental impact statement to analyze all actions implementing the CVPIA, including the direct and indirect impacts of all fish, wildlife, and habitat restoration actions and the potential renewal of all existing Central Valley Project water contracts. *Id.*

### 5. The Water Infrastructure Improvements for the Nation Act

The WIIN Act altered the traditional "repayment" landscape by explicitly authorizing the conversion of existing "water service" contracts to "repayment contacts" to allow for the prepayment of project-related construction debts. WIIN Act, § 4011(a). The WIIN Act required contractors choosing to convert their contracts to repay their portion of construction costs in either a "lump sum" or by "accelerated prepayment" within three years, instead of repaying those costs over an extended 25-year period. *Id.* § 4011(a)(2)(A). Funds generated from these payments

11

were to be used to fund "the construction of water storage" projects. *Id.* § 4011(e)(2).

To facilitate accelerated repayment, Congress mandated that Reclamation, upon request by a contractor,

> *shall* convert any water service contract in effect on the date of enactment of this subtitle and between the United States and a water users' association to allow for prepayment of the repayment contract pursuant to paragraph (2) under mutually agreeable terms and conditions.

*Id.* § 4011(a)(1) (emphasis added).[1]

Paragraph (1) of Section 4011(a) thus requires Reclamation to convert contracts upon request by a contractor and explains the purpose for which contracts are to be converted: "to allow for prepayment of the repayment contract." WIIN Act, § 4011(a)(1). Paragraph (2) then sets parameters for prepayment of irrigation contracts, *id.* § 4011(a)(2), and paragraph (3) sets similar parameters for prepayment of contracts for municipal, industrial and miscellaneous purposes. Both paragraphs

---

[1] In addition, Congress incentivized irrigation water users to convert their contracts by exempting converted contracts from certain requirements of the Reclamation Reform Act, Pub. L. No. 97-293, 96 Stat. 1261 (1982), including the limitation on the number of acres that can be irrigated with water from Reclamation facilities (commonly referred to as the "excess land provisions."). WIIN Act, § 4011(c)(1).

mandate that the converted contracts continue indefinitely, "so long as the contractor pays applicable charges." *Id.* § 4011(a)(2)(D); § 4011(a)(3)(C).

Paragraph (4) imposes "conditions" on all contracts entered into pursuant to the WIIN Act. *Id.* § 4011(a)(4). Most relevant here, sub-paragraph (C) expressly instructs that the terms of the converted contracts shall "not modify other *water service*, repayment, exchange and transfer contractual rights between the water users' association [contractor], and the Bureau of Reclamation . . . ."[2] *Id.* § 4011(a)(4)(C) (emphasis added).

In addition to setting out the process and terms for converting contracts to enable prepayment, the WIIN Act includes general savings language. The savings clauses, among other things, prevent the Act from being interpreted or implemented to modify any obligation under the CVPIA, or to modify the applicability of the ESA, including the application of existing smelt and salmonid biological opinions to the Project's operation. *Id.* § 4012(a)(2) & (3). Another savings clause

---

[2] The Act defines "water users' association" very broadly to include every possible form of contractor. *See* WIIN Act, § 4011(f)(5).

13

expressly prohibits Reclamation from interpreting or implementing the Act in a manner that "would cause additional adverse effects on listed fish species beyond the range of effects anticipated to occur to the listed fish species for the duration of the applicable biological opinion." *Id.* § 4012(a)(4).

Finally, other provisions of the WIIN Act speak to endangered species and NEPA. Section 4010 sets out the "actions" Congress intends Reclamation to take "to benefit threatened and endangered species and other wildlife," including a detailed monitoring program. *See* WIIN Act § 4010(a)(1). Section 4007 instructs that if Reclamation uses funds derived from prepayment to finance new storage projects it "shall comply with all applicable environmental laws, including the National Environmental Policy Act." *Id.* §§ 4007(h), (b)(4) & (c)(3).

## B. Factual background

### 1. The Central Valley Project

The Central Valley Project is the nation's largest federal water management project. *Central Delta Water Agency v. Bureau of Reclamation,* 452 F.3d 1021, 1023 (9th Cir. 2006). Reclamation operates the CVP in conjunction with California's State Water Project. *Natural*

14

*Res. Def. Council v. Haaland*, 102 F.4th 1045, 1056 (9th Cir. 2024). The CVP "is a network of reservoirs, canals, dams and hydroelectric powerplants that draws and regulates water from the Sacramento-San Joaquin River Delta." *Id.* It generates electricity, supplies drinking water for about 25 million people, supports billions of dollars in agriculture in more than two hundred water districts, and provides water to federal, state, and local wildlife refuges.

The Project's water is delivered pursuant to more than 250 contracts with various agricultural, industrial, and commercial entities and municipal water agencies. Order at 5. Those contracts govern the distribution of water throughout the CVP. *See* 43 U.S.C. § 485h(e). The contracts are also how the government recoups some of the federal funds spent constructing the project, along with a share of the project's operation and maintenance expenses. *Id.*

Reclamation operates the CVP in a complex statutory and regulatory environment. As discussed below, that environment includes extensive environmental review, both at a programmatic level that governs long-term operations, and narrower review focused on discrete agency actions. *See generally, e.g., Haaland*, 102 F.4th at 1056-59

15

(discussing "Reclamation's decades-long history of obtaining the necessary environmental approvals" to operate the CVP).

### 2. Reclamation's environmental review and ESA consultation related to the Central Valley Project

Reclamation operates the CVP consistent with a programmatic environmental impact statement that Reclamation prepared under NEPA to assess the project's long-term environmental effects. Its operations are also governed by programmatic biological opinions on impacts to federally listed species and habitat prepared by the U.S. Fish and Wildlife Service ("FWS") and National Marine Fisheries Service ("NMFS").

Reclamation's environmental review and ESA consultation proceed pursuant to a two-tiered process the agency established after Congress enacted the CVPIA. Order at 9. As to the ESA, Reclamation initiated consultation with FWS concerning its implementation of the CVPIA and its ongoing operation and maintenance of the CVP. *See Haaland*, 102 F.4th at 1057. Reclamation and FWS established a two-track process for ESA consultation. *Id.* The first track "involve[d] consultation on the coordinated operation of the [Central Valley Project and California's

16

State Water Project], resulting in a broad, program-wide biological opinion." *Id.* "The second track would involve consultations on narrower, discrete actions, such as the renewal of specific water contracts, and result in decisions that could be based on (or tiered from) the broader biological opinion." *Id.*

FWS issued a CVPIA biological opinion in 2000, which "addressed the effects upon listed species resulting from implementation of this suite of actions as a whole, and provided a strategy, or process, to determine how ESA compliance will be accomplished for individual activities that cumulatively make up the program." *Id.* (cleaned up). Reclamation has engaged in additional first-track consultations with FWS and NMFS over the years, resulting in multiple biological opinions that govern its operation of the Central Valley Project. *See id.* at 1057-62. For example, Reclamation reinitiated consultation on the long-term operation of the Central Valley Project in August 2016, resulting in biological opinions adopted in February 2020. 2-ER-112. Reclamation reinitiated consultation with the services again in 2021, *id.*, and both services

17

adopted new programmatic biological opinions in 2024.[3]

Reclamation has also undertaken extensive NEPA review related to its operation of the CVP. In 1999, it adopted the Central Valley Project Improvement Act Final Programmatic Environmental Impact Statement in compliance with CVPIA § 3409. *See* Order at 11. That programmatic environmental impact statement addressed the impacts of Reclamation's CVP operations, while "defer[ring] certain aspects of the environmental review to be completed during the contract renewal process." *Id.* at 11-12. In December 2024, Reclamation issued a Final Environmental Impact Statement on the long-term operation of the CVP and the State Water Project and, most recently, Reclamation issued a Record of Decision on long-term CVP operations in December 2025.[4]

---

[3] FWS's November 2024 Programmatic Biological Opinion for the Reinitiation of Consultation of the Long-Term Operations of the Central Valley Project and State Water Project is available at https://www.usbr.gov/mp/bdo/docs/11.8.24_lto-final-biological-opinion.pdf. NMFS's December 2024 Endangered Species Act Section 7(a)(2) Programmatic Biological Opinion for the Reinitiation of Consultation on the Long-Term Operation of the Central Valley Project and State Water Project is available at https://s3.amazonaws.com/media.fisheries.noaa.gov/2024-12/lto-biological-opinion-appendices-2024.pdf.

[4] Reclamation's 2025 ROD and 2024 EIS are available at https://www.usbr.gov/mp/nepa/nepa_project_details.php?Project_ID=54661.

### 3. Conversion of the contracts

The vast majority of CVP contractors (and all the contractors who converted their contracts under the WIIN Act) have held water service contracts rather than repayment contracts for the CVP. The WIIN Act facilitated conversion of water service contracts to repayment contracts by allowing Reclamation to calculate a fixed repayment obligation from "the remaining construction costs identified in water project specific irrigation [or municipal and industrial] rate repayment schedules" and allowed the contractors to prepay this repayment obligation. WIIN Act, §§ 4011(a)(2)(A) and 4011(a)(3)(A). After Congress enacted the WIIN Act, contractors started requesting Reclamation convert their contracts.

In converting the contracts, Reclamation did not alter the maximum quantity of water to be delivered or otherwise modify water delivery provisions of the prior water service contracts. 2-ER-117-118 (citing declaration of Reclamation official who oversaw the project-wide negotiation of contract conversions under the WIIN Act, filed in *N. Coast Rivers Alliance v. U.S. Dept. of the Interior*, 1:16-cv-307, (E.D. CA)).

As of September 2021, when the parties submitted their joint statement of facts to the district court, Reclamation had converted 67

Central Valley Project contracts under Section 4011 of the WIIN Act. Order at 13. Twenty-three additional contract conversions were pending, and sixteen contracts were in early stages of conversion. *Id.* The converted contracts address almost three million acre-feet of water annually. The converted contracts remain in effect and do not have any expiration date.

While the contracts provide quantities of water to be delivered, those contractual amounts are not guaranteed. *See, e.g.*, Westlands Contract Art. 3(b), 2-ER-168 (noting "the likelihood of the Contractor actually receiving the amount of Project Water set out in subdivision (a) of this Article in any given Year is uncertain."). Instead, annual water deliveries are subject to water availability and the biological opinions discussed above.

## C. Proceedings below

Plaintiffs are three conservation groups who sued in 2020 challenging Reclamation's conversion of contracts under the WIIN Act and seeking to void the converted contracts. 2-ER-333. Contractor Defendant-Appellees are public agencies that enter contracts with Reclamation to receive, pay for, and use water from the Central Valley

20

Project. *Id.* In February 2021, the district court granted Reclamation's motion to compel joinder of the Contractor Defendants 2-ER-345.

Plaintiffs' operative complaint alleges that Reclamation violated NEPA by failing to prepare an environmental report prior to converting contracts under the WIIN Act. *See* 1-ER-006-007. It also alleges that Reclamation violated the ESA by failing to undertake Section 7 consultation.[5] *Id.*

On June 30, 2025, the district court entered summary judgment for Reclamation, ruling against Plaintiffs on all counts. In a thorough, 67-page opinion, the court methodically considered each argument Plaintiffs raised and held that none were persuasive.

First, the district court examined the WIIN Act's text. 1-ER-039-045. It considered Plaintiffs' argument that subsection 4011(a)'s language requiring Reclamation to convert contracts "to allow for

---

[5] Two other related cases are pending in the district court: *North Coast Rivers Alliance, et al., v. United States Department of the Interior*, et al., Case. No. 1:16-cv-00307 JLT EPG, and *Hoopa Valley Tribe v. U.S. Bureau of Reclamation, et al.*, 1:20-cv-1814 JLT EPG. The district court's opinion here addressed all of Plaintiffs' claims and two claims raised in the operative complaint in *North Coast Rivers Alliance.* 1-ER-006-007 & n. 3. Because the district court has not ruled on the remaining claims in *North Coast River Alliance*, that case is not yet ripe for appeal.

21

prepayment of the repayment contract . . . under mutually agreeable terms and conditions" afforded Reclamation discretion sufficient to require NEPA review and ESA consultation. 1-ER-038-039. The district court found the text of subsection 4011(a)'s "standing alone," to be inconclusive. 1-ER-041. But it concluded that subparagraph 4011(a)(4)(C) constrained how Section 4011 operates by "instruct[ing] Reclamation not to modify existing rights held by the contracting party. 1-ER-044-045. That interpretation was consistent with the WIIN Act's purpose of "fund[ing] the construction of water storage projects" because it incentivized contractors to convert water service contracts to accelerated repayment contracts. 1-ER-047.

The district court then considered at length the WIIN Act's various savings clauses and cross-references to provisions of the CVPIA, 1-ER-047-063, ultimately concluding that the clauses "have little bearing on the interpretive questions presented in this case." 1-ER-063.

Finally, the district court considered Plaintiffs' argument that Reclamation acted contrary to its interpretation of the WIIN Act by "changing the terms of water service during the contract conversion process." 1-ER-063-067. After closely examining each alleged change, the

22

district court found that the changes "do not amount to material changes to 'water service . . . contractual rights.'" 1-ER-069.

Setting forth the best interpretation of the statute, the district court held that "(1) the WIIN Act requires contract conversion upon request, and (2) WIIN Act § 4011(a)(4)(C) strips [R]eclamation of discretion to modify any 'water service . . . contractual rights' other than those related to the financial terms specifically addressed by the WIIN Act." 1-ER-070. The WIIN Act thus "makes it 'impossible for the agency to exercise discretion for the protected species benefit,' meaning that Section 7 of the ESA does not apply to the contract conversion process." *Id.* The court found that conclusion dispositive of the NEPA analysis as well. 1-ER-070-071.

## SUMMARY OF ARGUMENT

The central question in this case is whether the WIIN Act afforded Reclamation discretion in converting water service contracts into accelerated repayment contracts, such that Reclamation should have undertaken NEPA review and ESA Section 7 consultation. Because the WIIN Act requires Reclamation to convert contracts "upon request" and prohibits Reclamation from modifying contractual rights beyond the

23

financial terms of repayment, the district court correctly determined that neither NEPA review nor ESA consultation was required.

Plaintiffs do not offer a plausible contrary reading of the WIIN Act's text. Instead, they devote most of their brief to other statutory and contractual language, misinterpreting provisions in prior contracts and relying on doctrines like the canon against implied repeals that do not apply here. The district court correctly rejected those arguments, and this Court should affirm.

1.     Because this case turns on statutory interpretation, the Court should begin its analysis with the text of the WIIN Act. That Act states that Reclamation "shall" convert water service contracts to allow for prepayment "upon request" of the contractor. WIIN Act § 4011(a). In doing so, the WIIN Act imposed a mandatory and nondiscretionary duty. Although it permitted Reclamation to negotiate mutual terms and conditions for prepayment, the WIIN Act made clear that Reclamation could not alter or modify any existing water service or contractual rights between the contractors and Reclamation. Thus, Reclamation lacked discretion to modify or negotiate contractual terms that might affect the environment or benefit or harm fish.

24

2. Reclamation's compliance with the mandatory duty imposed by the WIIN Act was not a "major federal action" under NEPA. NEPA requires agencies to prepare an environmental report for certain "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). Under the statute as amended and longstanding case law, NEPA does not require environmental review for "activities or decisions that are non-discretionary and made in accordance with the agency's statutory authority." *Id.* § 4336e(10)(B)(vii). Because Reclamation's conversion of contracts here was mandatory and nondiscretionary, Reclamation was not required to undertake NEPA review before converting those contracts.

3. Reclamation's conversion of water service contracts under the WIIN Act also does not trigger any obligation to consult under Section 7 of the ESA. As the Supreme Court has held, Section 7 "covers only discretionary agency actions" and is not triggered by actions "that an agency is required by statute to undertake." *Home Builders*, 551 U.S. at 669. Because Reclamation was required to convert contracts under the WIIN Act, it was not required to consult under Section 7 before complying with that statutory mandate.

25

4. Neither the WIIN Act's savings clauses nor the President's signing statement alter that analysis. The savings clauses merely preserve the status quo as to applicable legal and statutory obligations. But they do not impose an obligation on Reclamation to undertake NEPA review or Section 7 consultation when converting contracts. And the President's high-level signing statement discussed the WIIN Act's compromises with respect to operations of the Central Valley Project. It did not suggest any new obligation that Reclamation undertake NEPA review or Section 7 consultation beyond the requirements set forth in those statutes.

5. Plaintiffs' attempt to rely on the canon against implied repeal is misplaced. As Reclamation argued and the district court correctly held, this case should be decided based on the ordinary operation of NEPA and the ESA as applied to the text of the WIIN Act. Reclamation has never argued that the WIIN Act displaced any otherwise applicable obligation under NEPA or the ESA. Instead, the relevant question is whether the WIIN Act triggered obligations under those statutes. This Court need not find any implied repeal to affirm the judgment of the district court here.

26

6. Finally, Plaintiffs' arguments based on the prior water service contracts fail as well. Plaintiffs contend that the prior contracts required Reclamation to undertake ESA consultation and NEPA review. That is wrong. The prior contracts bound *contractors* to comply with applicable terms and conditions from biological opinions, and limited the duration of water service contracts that Reclamation could enter pending the completion of any required NEPA review. The contracts did not require environmental review or consultation for contract conversions under the WIIN Act. Thus, Reclamation's revisions to those terms in the converted contracts merely maintained the status quo in compliance with the WIIN Act. They did not substantively modify water service contractual rights.

The district court correctly entered summary judgment for Reclamation. This Court should affirm.

## STANDARD OF REVIEW

This Court reviews de novo a district court's grant of summary judgment. *Haaland*, 102 F.4th at 1063. In a challenge to agency action, the Court reviews the merits of Plaintiffs' legal challenges under the deferential standard of the Administrative Procedure Act ("APA"). *Westlands Water Dist. v. U.S. Dep't of the Interior*, 376 F.3d 853, 865 (9th

27

Cir. 2004) (quoting 5 U.S.C. § 706(2)(A)). Under the APA, agency decisions may be set aside if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A). The standard of review is "highly deferential, presuming the agency action to be valid and affirming the agency action if a reasonable basis exists for its decision." *Nw. Ecosystem All. v. U.S. Fish & Wildlife Serv.*, 475 F.3d 1136, 1140 (9th Cir. 2007) (citation omitted).

To resolve the meaning of disputed statutory language, a court shall adopt the interpretation that the court, "after applying all relevant interpretive tools, concludes is best." *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369, 400 (2024). "Careful attention to the judgment of the Executive Branch may help inform that inquiry." *Id.* at 412-13.

## ARGUMENT

**I.    The WIIN Act imposes a nondiscretionary obligation on Reclamation to convert water service contracts "upon request."**

Because this case turns on statutory interpretation, this Court should begin its analysis with the WIIN Act's text. *United States v. Harrell*, 637 F.3d 1008, 1010 (9th Cir. 2011) ("As in any case of statutory construction, our analysis begins with the language of the statute."

28

(citation omitted)); *Bartenwerfer v. Buckley*, 598 U.S. 69, 74 (2023) ("We start where we always do: with the text of the statute.") (cleaned up). We start with that language (part A) before turning to Plaintiffs' arguments under NEPA (part B) and the ESA (part C), as well as their arguments based on the WIIN Act's savings clauses (part D) and signing statement (part E).

### A. Section 4011 creates a mandatory duty and limits Reclamation's discretion to negotiating financial terms of repayment.

The first paragraph of Section 4011(a) of the WIIN Act states, in pertinent part:

> (1) CONVERSION AND PREPAYMENT OF CONTRACTS.— Upon request of the contractor, the Secretary of the Interior shall convert any water service contract in effect on the date of enactment of this subtitle and between the United States and a water users' association to allow for prepayment of the repayment contract pursuant to paragraph (2) under mutually agreeable terms and conditions.

WIIN Act § 4011(a)(1).

Paragraph (2) then sets parameters for prepayment of irrigation contracts, and paragraph (3) sets similar parameters for contracts for municipal, industrial and other purposes. *Id.* §§ 4011(2)-(3).

29

Paragraph 4 then places the following conditions on contract conversions:

(4) CONDITIONS.—All contracts entered into pursuant to paragraphs (1), (2), and (3) shall—

(A) not be adjusted on the basis of the type of prepayment financing used by the water users' association;

(B) conform to any other agreements, such as applicable settlement agreements and new constructed appurtenant facilities; and

(C) not modify other water service, repayment, exchange and transfer contractual rights between the water users' association, and the Bureau of Reclamation, or any rights, obligations, or relationships of the water users' association and their landowners as provided under State law.

*Id.* § 4011(a)(4).

The statutory language of paragraph (1) is mandatory: "[u]pon the request of the contractor," the Secretary "*shall* convert any water service contract . . . to allow for prepayment of the repayment contract pursuant to paragraph (2) under mutually agreeable terms and conditions." *Id.* § 4011(a)(1) (emphasis added). As courts have repeatedly recognized, Congress uses the term "shall" to impose mandatory, nondiscretionary obligations. *See, e.g., Lexecon Inc. v. Milberg Weiss Bershad Hynes &*

30

*Lerach,* 523 U.S. 26, 35, (1998) ("[T]he mandatory 'shall' . . . normally creates an obligation impervious to judicial discretion"); *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 661-62 (2007) (collecting cases). Thus, Section 4011 requires Reclamation to convert water service contracts upon request. Reclamation cannot decline to do so.

The statute also directs Reclamation "to allow for prepayment of the repayment contract . . . under mutually agreeable terms and conditions." WIIN Act § 4011(a)(1). Thus, the "terms and conditions" for the "prepayment" must be "mutually agreeable." Then, in paragraph (4), the statute imposes additional conditions on "all" converted contracts, including that they "shall" "not modify other water service, repayment, exchange and transfer contractual rights between the water users' association, and the Bureau of Reclamation . . . ." *Id.* § 4011(a)(4)(C).

Read together, the WIIN Act imposes a mandatory duty on Reclamation to convert water service contracts "upon the request of the contractor." *Id.* § 4011(a)(1). In carrying out the conversion, it instructs Reclamation "to allow for prepayment of the repayment contract" "under mutually agreeable terms and conditions," but prohibits Reclamation from modifying any "other water service, repayment, and transfer

31

contractual rights." *Id.* Thus, while the statute empowers Reclamation to negotiate mutual terms and conditions for prepayment, it also limits the scope of any terms and conditions by setting certain parameters for prepayment, *id.* § 4011(a)(2)-(3), and prohibiting Reclamation from modifying other contractual rights, *id.* § 4011(a)(4)(C).

Plaintiffs contend that Reclamation should have prepared an environmental analysis under NEPA and consulted under Section 7 of the ESA prior to converting the contracts. But, as shown below, Reclamation's conversion of water service contracts pursuant to the WIIN Act is a nondiscretionary act that does not trigger NEPA's environmental review or Section 7's consultation obligations.

## B. Reclamation's conversion of water service contracts under Section 4011 is not a major federal action that requires NEPA review.

NEPA requires agencies, in some circumstances, to analyze environmental effects and issue an environmental report when they have a decision to make. That review is "a procedural cross-check" meant to "to inform agency decisionmaking." *Seven Cnty.*, 605 U.S. at 173. Because NEPA's principal purpose is to aid agencies in their decisionmaking, courts have long recognized that NEPA does not require agencies to

32

undertake environmental review for mandatory, nondiscretionary actions. *See, e.g.*, *Alaska Wilderness League v. Jewell*, 788 F.3d 1212, 1225 (9th Cir. 2015) (nondiscretionary acts "not subject to NEPA's requirements"); *Sierra Club v. Babbitt*, 65 F.3d 1502, 1512 (9th Cir. 1995) (observing that case law "excus[es] nondiscretionary agency action or agency 'inaction' from the operation of NEPA."). That makes sense, because when an agency is required by statute to take a specific act, there is no decision for the environmental report to inform.

Congress codified that longstanding, foundational principle when it amended NEPA in 2023. Fiscal Responsibility Act of 2023, Pub. L. No. 118-5, § 111, 137 Stat. 10, 45-46 (2023). The amendments confirm in numerous places that agencies do not need to prepare environmental documents for nondiscretionary acts like the contract conversions at issue here.[6]

---

[6] Congress amended NEPA in 2023, several years after it enacted the 2016 WIIN Act and after Reclamation had converted many contracts pursuant to Section 4011. The statute as amended is applicable here, however, as it "strongly reinforces the basic principles that NEPA, correctly interpreted, already embodied." *See Seven Cnty.*, 605 U.S. 181 n.3 (applying NEPA as amended to case challenging 2021 agency approval). *See also* Pls.' Br. 41-42 (citing NEPA as amended).

To start, NEPA requires agencies to prepare an environmental report for "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). NEPA defines the term "major federal action" to expressly exclude "activities or decisions that are non-discretionary and made in accordance with the agency's statutory authority." *Id.* § 4336e(10)(B)(vii). The statutory text also makes clear that NEPA applies when the agency is considering a "proposal" for major federal action. *Id.* § 4332(2)(C). And it defines a "proposal" as "a proposed action at a stage when an agency has a goal, is actively preparing to make a decision on one or more alternative means of accomplishing that goal and can meaningfully evaluate its effects." *Id.* § 4336e(12).

And finally, in the section setting out the appropriate level of environmental review, NEPA reiterates that agencies do not need to prepare any environmental document if "the proposed agency action is a nondiscretionary action with respect to which such agency does not have

34

authority to take environmental factors into consideration in determining whether to take the proposed action." *Id*. § 4336(a)(4).[7]

Congress thus made abundantly clear in the statute what courts have long recognized: NEPA's environmental review requirement does not apply to nondiscretionary agency actions. When an agency is required to take specific action, there is no decision for environmental review to inform.

Applying that standard here, Reclamation's conversion of water service contracts under the WIIN Act is precisely the type of nondiscretionary act that does not trigger NEPA's review requirement. In the WIIN Act, Congress imposed a mandatory duty requiring Reclamation to "convert any water service contract" "upon the request of the contractor." WIIN Act. § 4011(a)(1). The event that triggers the conversion is merely "the request of the contractor." *Id*. Once that request

---

[7] NEPA also makes clear that agencies need not prepare an environmental report if "the proposed agency action is excluded pursuant to one of the agency's categorical exclusions, another agency's categorical exclusions . . ., or another provision of law." 42 U.S.C. § 4336(a)(2). Thus, even if Reclamation's conversion of contracts under the WIIN Act were a discretionary major federal action (it is not), Reclamation still would not necessarily have been required to prepare an environmental assessment or impact statement, contrary to the suggestion of Plaintiffs and amici. *See, e.g.*, Pls.' Br. 17; Dkt. No. 45.1 at 20.

is made, Reclamation "shall" convert the contract. *Id.* There thus is no discretionary decision for environmental review to inform; Reclamation must convert the contracts.

That does not mean that Reclamation's delivery of water under the converted contracts is never subject to environmental review under NEPA. To the contrary, Reclamation's operations—including delivery of water to contractors—are comprehensively analyzed in Reclamation's programmatic environmental impact statements. *See supra* at 16-18.

In arguing that Reclamation should have undertaken NEPA review for the contract conversions at issue here, Plaintiffs point to the text directing the Secretary to "allow for prepayment . . . on mutually agreeable terms and conditions." Pls.' Br. 47. Plaintiffs insist that this language means "Reclamation had ample discretion . . . to perform NEPA environmental review before entering into conversion contracts." *Id.* Plaintiffs' framing is misleading and flips the standard on its head. The question is not whether the WIIN Act prohibits Reclamation from considering environmental effects. The question under NEPA is whether converting water service contracts was itself a discretionary act (i.e., a "major federal action") that triggered NEPA's statutory review

36

requirement. 42 U.S.C. § 4336e(10)(B)(vii); *see also Alaska Wilderness League*, 788 F.3d at 1225 (nondiscretionary acts "not subject to NEPA's requirements"). As to that question, Plaintiffs never suggest that Reclamation could have decided not to convert the contracts. And they do not say what purpose the environmental review should have served or what decision they think the environmental review was meant to inform.

If Plaintiffs contend that an environmental report could have informed Reclamation's negotiation of "mutually agreeable terms and conditions," that argument fails under the text of Section 4011 when read as a whole. At the outset, paragraph (1) states that Reclamation shall "allow for prepayment of the repayment contract pursuant to paragraph (2) under mutually agreeable terms and conditions." WIIN Act § 4011(a)(1). The prepositional phrase "under mutually agreeable terms and conditions" modifies "prepayment of the repayment contact pursuant to paragraph (2)." Thus, the scope of the terms and conditions is limited to the terms of prepayment.

The language does not suggest that Congress intended Reclamation to impose additional environmental conditions unrelated to the prepayment. It is not happenstance that both Plaintiffs (Br. 45-47) and

37

various amici (*see, e.g.*, Dkt. No. 45.1 at 17; Dkt. No. 47.2 at 17; Dkt. No. 54.2 at 16) repeatedly quote this phrase in isolation, without the important language preceding it, that clarifies it is discussing the terms and conditions of prepayment. It is not Reclamation that is trying to add the word "financial" to this phrase (*contra* Plaintiffs' Br. 45); the statute itself makes clear that "mutually agreeable terms and conditions" refer to "prepayment of the repayment contract." WIIN Act § 4011(a)(1). It is Plaintiffs that are attempting to rewrite the statute by omitting the language that the phrase "mutual terms and conditions" modifies.

But even if that were not so, § 4011(a)(4) forecloses any ambiguity and cuts off any discretion to change other terms and conditions. There, Congress prohibited Reclamation from "modify[ing] other water service, repayment, exchange and transfer contractual rights between the water users' association, and the Bureau of Reclamation." *Id.* § 4011(a)(4)(C). That limitation makes clear that Congress did not intend Reclamation to use conversion of the contract as an opportunity to impose new environmental conditions or otherwise alter a contractor's rights under the existing repayment contract. *See Sturgeon v. Frost*, 577 U.S. 424, 438 (2016) ("Statutory language 'cannot be construed in a vacuum. It is a

38

fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme.'" (quoting *Roberts v. Sea-Land Servs., Inc.*, 566 U.S. 93, 101 (2012) (internal quotation marks omitted)).

Plaintiffs argue that the word "other" in paragraph (4) "only makes sense if it applies to contracts other than the subject converted contracts." Pls.' Br. 47. But that is plainly incorrect; the explanation that Congress sought to encourage conversion to repayment contracts by foreclosing modifications of other contractual rights makes perfect sense. Paragraph (4) prohibits Reclamation from modifying "other water service, repayment, exchange and transfer contractual rights." WIIN Act § 4011(a)(4)(C). As the district court explained, the language references "other . . . contractual rights," not "other contracts." 1-ER-047.

The best reading, endorsed by the district court, is that paragraph 4(C) "concern[s] the protection of existing rights." 1-ER-045. That reading also makes sense given the WIIN Act's undisputed purpose "to fund the construction of water storage projects." 1-ER-047. As the district court explained, Congress furthered that purpose by "provid[ing] incentives to encourage Contractors to elect to convert their water service contracts to

39

accelerated prepayment contracts." *Id.* Preserving the contractors' existing terms of water service also encourages conversion, including by ensuring that a contractor could elect to convert its contract without opening itself up to the risk that it could end up with less water following contract negotiation and environmental review. *Id.* By contrast, Plaintiffs' reading would preserve only existing rights in contracts other than the ones being converted—a result that is not based on the statute's text and that, in the words of the district court, simply "does not make practical sense." 1-ER-044.

Plaintiffs' citation of Article 26 of the Westlands contract (which the parties stipulated to use as a representative converted contract) fares no better. *See* Pls.' Br. 48 (citing 2-ER-205). Plaintiffs point to a term in Article 26 stating that the converted contract "shall not be construed as limiting or curtailing any rights which the Contractor . . . acquires or has available under any other contract pursuant to Federal Reclamation law." *Id.* Plaintiffs claim that this provision in Article 26 of the converted contracts "is consistent with WIIN Act section 4011(a)(4)(C) meaning that the converted contracts do not modify provisions in *other* contracts than the converted contracts." Pls.' Br. 48. But the two provisions use

40

different terms to serve two different purposes. Article 26 includes a common contract term designed to ensure that the contract is not interpreted in a way that affects rights under other contracts. *Id.* ("[T]his contract shall not be construed . . ."). WIIN Act Section 4011(a)(4)(C), by contrast, substantively prohibits Reclamation from modifying other existing contractual rights. § 4011(a)(4)(C) (converted contracts shall "not modify . . ."). If anything, the comparison to Article 26 only highlights that Congress could easily have referenced "other contracts" in the WIIN Act if that was its intent. It did not.[8]

In sum, the WIIN Act imposed on Reclamation a mandatory duty to convert water service contracts "upon request" and prohibited it from modifying "other contractual rights," including "water service" rights.

---

[8] Plaintiffs cite *Aluminum Co. of Am. v. Central Lincoln Peoples' Utility Dist.*, 467 U.S. 380, 398 (1984) for the proposition that agencies "retain broad discretion in negotiating and finalizing contracts." Pls.' Br. 46-47. But that case is inapposite, and that principle has no application to contract conversion under Section 4011 of the WIIN Act. That case did not involve any NEPA or ESA claim and turned on the Court's analysis of the whether the specific statute at issue "comprehensively establish[ed] the terms" of the contract. 467 U.S. at 398. There, the Court found the Bonneville Power Administration had some discretion to negotiate certain contract terms under the statutes at issue, but none of those statutory provisions contained the kind of express prohibition on modifying "contractual rights" that appears in WIIN Act § 4011(a)(4)(C).

41

Reclamation thus correctly determined that NEPA review was not required.

### C. Reclamation's nondiscretionary conversion of water service contracts also does not trigger an obligation to consult under the ESA.

Plaintiffs' ESA claim fails for the same reason as their NEPA claim: Reclamation's conversion of water service contracts was a mandatory, nondiscretionary act that did not require Reclamation to consult under Section 7 of the ESA. It is well-settled that Section 7's consultation obligation "covers only discretionary agency actions" and is not triggered by actions "that an agency is *required* by statute to undertake once certain specified triggering events have occurred." *Home Builders*, 551 U.S. at 669; *Envtl. Prot. Info. Ctr. v. Simpson Timber Co.*, 255 F.3d 1073, 1081-82 (9th Cir. 2001) (no duty to reinitiate consultation for previously issued permits where agency lacked discretion to add protections for newly listed species); *Grand Canyon Tr.*, 691 F.3d at 1017-18 (consultation only required "if the agency has the discretionary control 'to inure to the benefit of a protected [listed] species.'" (citation omitted)); 50 C.F.R. § 402.03 ("Section 7 and the requirements of this part apply to

42

all actions in which there is discretionary Federal involvement or control.").

As explained below, the WIIN Act required Reclamation to convert the contracts upon request and prohibited it from modifying any of the terms that could benefit or harm listed species. Thus, this case is different than the cases cited by Plaintiffs (Pls.' Br. 31) where this Court found that Reclamation had discretion and must consult before renewing a contract.

Plaintiffs do not dispute that Section 7 applies only to discretionary acts but contend that Reclamation had discretion in converting water service contracts that obligated it to undertake Section 7 consultation. *See, e.g.,* Pls.' Br. 47 ("Reclamation had ample discretion to engage in ESA consultation to protect endangered and threatened species."). As explained above, however, the best reading of the WIIN Act is that Congress imposed a mandatory duty on Reclamation to convert water service contracts "upon request" and did not confer Reclamation with discretion to modify water service and other contractual rights to impose new or additional environmental conditions in the conversion process.

43

As the district correctly observed, Plaintiffs' ESA claim is "directly governed by" the Supreme Court's decision in *Home Builders*. Order 19. *Home Builders* considered whether a provision of the Clean Water Act, which required the Environmental Protection Agency to transfer permitting powers to state authorities upon application so long as nine statutory criteria were met, triggered a consultation obligation under Section 7 of the ESA. 551 U.S. at 648. Relying on Section 7's implementing regulation, 50 C.F.R. § 402.03, which it upheld as a reasonable interpretation of the ESA, *Home Builders* made clear that "[Section] 7(a)(2)'s no-jeopardy duty covers only discretionary agency actions and does not attach to actions . . . that an agency is *required* by statute to undertake once certain specified triggering events have occurred." *Id.* at 669. The Court therefore agreed with the agency's determination that the Clean Water Act "stripped it of authority to disapprove a transfer based on any other considerations"—including protections for endangered species—beyond the nine statutory criteria. *Id.* at 654, 662.

This Court should reach the same conclusion here. Just as the agency in *Home Builders* was required to transfer authorizations under

44

the Clean Water Act so long as the statutory criteria were met, here, Reclamation is required to convert water service contracts "upon request." WIIN Act § 4011(a)(1). It lacks any discretion to do otherwise; the statute leaves no room for the agency to take an action inuring to the benefit of a listed species when converting a contract. And, though it retained limited discretion to negotiate mutually agreeable terms and conditions about "prepayment of the repayment contract," *id.*, the WIIN Act prohibited Reclamation from using the converted contracts to "modify other water service, repayment, exchange and transfer contractual rights," *id.* § 4011(a)(4)(C).

In arguing to the contrary, Plaintiffs point to the Court's decision in *Natural Resources Defense Council v. Houston*, 146 F.3d 1118 (9th Cir. 1998). Pls.' Br. 46. At issue there was a statute that directed Reclamation to "include in any long-term contract hereafter entered . . . if the other contracting party so requests, for renewal thereof under stated terms and conditions mutually agreeable to the parties." 43 U.S.C. 485h-1(1). The Court held that, because "there was some discretion available to the Bureau during the negotiation process," Section 7's consultation obligations applied. 146 F.3d at 1126.

45

In reaching that conclusion, the Court pointed to other provisions in the statute, which stated that "water rights are based on the amount of available project water," and "that [Reclamation] has the discretion to set rates to cover an appropriate share of the operation and maintenance costs." *Id.* Reading those provisions together, the Court held that Reclamation had discretion to alter "key terms in the contract," including to "reduce the amount of water available for sale if necessary to comply with the ESA." *Id.*

The Court's holding in *Houston* thus was not based solely on the phrase "mutual terms and conditions" but on the overall structure of the relevant statute. Because the statute provided Reclamation discretion to alter "key terms" that could inure to the benefit of a listed species of fish, the Court held that Reclamation had an obligation to consult under Section 7.

The WIIN Act provides no similar discretion here. As explained above, Section 4011 permits Reclamation to negotiate terms and conditions to "allow for prepayment of the repayment contract," but forbids it from "modify[ing] other water service, repayment, exchange and transfer contractual rights," *id.* § 4011(a)(1) & (4)(C). In particular,

46

Reclamation is prohibited from modifying "other water service . . . contractual rights," which means Reclamation *lacks* the ability to alter, for example, the contractual amounts or water delivery provisions in the underlying water service contract during the conversion.[9] Reclamation thus lacked discretion sufficient to trigger any consultation obligation under Section 7.[10]

### D.  The WIIN Act's savings clauses do not require NEPA review or ESA consultation for conversion of water service contracts.

Plaintiffs also rely on the WIIN Act's savings clauses, arguing that those clauses "preserved ESA and NEPA review." That is incorrect.

---

[9] As explained *supra* at 20, however, the converted contracts (like the prior contracts) include terms that shield Reclamation from legal liability if it declares annual shortages due to other legal obligations, including the ESA. *See* 2-ER-168.

[10] The Court's decision in *Natural Resources Defense Council v. Jewell*, 749 F.3d 776 (9th Cir. 2014), is similarly distinguishable. There, the Court held that Reclamation "retained 'some discretion' in in its contract negotiations with the Sacramento River Contractors to take measures that would benefit the delta smelt, such as deciding not to renew Settlement Contracts at all or changing key terms." *Haaland*, 102 F.4th at 1061 (discussing *Jewell*). Thus, whereas the act of renewing contracts was itself discretionary in *Jewell*, here Reclamation is required to convert contracts upon a contractor's request. And unlike in *Jewell* (and *Houston*), where Reclamation retained discretion to alter key terms to benefit species, here Reclamation was prohibited from altering any preexisting water service contractual rights, WIIN Act § 4011(a)(4)(C).

Plaintiffs begin with the false assumption that both environmental review under NEPA and consultation under Section 7 of the ESA are automatically required unless the WIIN Act expressly says otherwise. But as explained above and by the district court, NEPA and Section 7 of the ESA apply only when an agency is considering taking a discretionary action. By ordinary operation of those statutes, the obligations do not attach to mandatory actions like the contract conversions at issue here. As shown below, the WIIN Act's savings clauses do not alter that analysis.

### 1.    Section 4012(a)(2)

Plaintiffs first point to WIIN Act Section 4012(a)(2), which states that the Act "shall not be interpreted or implemented in a manner that" "affects or modifies any obligation under the Central Valley Project Improvement Act ('CVPIA') (Public Law 102-575; 106 Stat. 4706), except for the savings provisions for the Stanislaus River predator management program expressly established by section 11(d) and provisions in section 11(g)." WIIN Act § 4012(a)(2). Plaintiffs interpret this provision to mean that "the WIIN Act is not to be interpreted or implemented in a manner that affects or modifies any obligation under the CVPIA." Pls.' Br. 49.

48

The question then becomes what pertinent obligations the CVPIA imposes. Plaintiffs look to CVPIA Section 3404(c), which requires the Secretary to, "upon request, renew any existing long-term repayment or water service contract for the delivery of water from the Central Valley Project for a period of twenty-five years." CVPIA § 3404(c). It also provides that Reclamation "may renew such contracts for successive periods of up to 25 years each." *Id.*

Subsection (1) states that "[n]o such renewals shall be authorized until appropriate environmental review, including the preparation of the environmental impact statement required in section 3409 of this title, has been completed." *Id.* § 3404(c)(1). And subsection (2) states that, "[u]pon renewal of any long-term repayment or water service contract providing for the delivery of water from the Central Valley Project, the Secretary shall incorporate all requirements imposed by existing law, including provisions of this title, within such renewed contracts." *Id.* § 3404(c)(2).

Plaintiffs read these provisions to mean that Reclamation must undertake NEPA review and consult under Section 7 before renewing water service contracts. Pls.' Br. 32-33. And Plaintiffs contend these

49

CVPIA provisions concerning contract renewals should be treated as synonymous with contract conversions under the WIIN Act, such that the CVPIA requires NEPA review and Section 7 consultation before the contracts can be converted. *Id.* at 33.

That is wrong. To start, CVPIA Section 3404(c) concerns wholesale contract renewals, not the limited conversion of water service contracts to repayment contracts addressed by the WIIN Act. The CVPIA *requires* Reclamation to renew contracts in existence in 1992 (when Congress enacted the CVPIA) "upon request" for 25 years, and *permits* Reclamation to subsequently renew the contracts for successive, 25-year periods. By contrast, Section 4011 of the WIIN Act requires Reclamation, acting at the request of a contractor, to *convert* 25-year contracts into new prepayment contracts "with no term whatsoever." 1-ER-053. On its face, then, the CVPIA's provisions concerning an initial contract renewal for a 25-year term, and subsequent, successive 25-year terms, do not apply to the conversion contemplated by the WIIN Act.[11] *See id.* ("[B]y its own

---

[11] Plaintiffs' reliance on dictionary definitions of "renew" and "renewal," Pls.' Br. 52-53, does not alter the analysis. As the district court explained, "[r]elevant law does not appear to treat the terms as identical." 1-ER-052-053 (citing 43 U.S.C. § 485h-1). But even if the term "renew" could in some circumstances include a contract "conversion," the context here

terms," the CVPIA "does not permit any kind of renewal or conversion to a permanent contract.").[12]

Indeed, as the district court observed, "CVPIA § 3404(c) plainly is meant to *constrain* renewals to 25-year terms, while the WIIN Act *indisputably lifted that constraint* for contracts converted under WIIN Act § 4011." 1-ER-054. In other words, by providing for prepayment of contracts in the WIIN Act, Congress purposely moved away from long-term successive renewals. That suggests, as the district court concluded, that Congress "intentionally placed WIIN Act conversion contracts into a category that is not subject to CVPIA § 3404(c)(1)'s other restrictions, including any requirements for environmental review that might

---

makes clear that term renewals under the CVPIA are not synonymous with converting a water service contract into a repayment contract under the WIIN Act. For example, "renewal" generally occurs following, or in anticipation of, expiration of a contract term, while "conversion" is not done in anticipation of expiration and can occur at any point during a term of an existing contract, and maintains the status quo of the underlying water service contract.

[12] The district court, plaintiffs, and amici occasionally refer to the converted contracts as "permanent." But that is not correct. The contracts do not have definite terms, but they are not irrevocable. They are subject to a contractor's continuing payment of applicable charges and other applicable law. WIIN Act § 4011(a)(2)(D); *id.* § 4011(a)(3)(C).

motivate or require Reclamation to consider reducing contract quantities." *Id.*

These two provisions require Reclamation to take two very different actions, depending on the requests they receive. Reclamation cannot simultaneously comply with WIIN Act § 4110 by converting a water service contract to a repayment contract with no term *and* with CVPIA § 3404 by renewing water service contract with a 25-year term. Given this fundamental difference, Congress plainly sought to provide a new conversion authority with WIIN § 4110, not require that it somehow be layered upon the CVPIA § 3404's different renewal authority. Plaintiffs' arguments to the contrary would render WIIN § 4110 effectively meaningless, which was plainly not Congress' intent in passing that provision.

Moreover, even if CVPIA § 3404(c) did apply to the WIIN Act conversions (it does not), subsection (1) merely requires "appropriate environmental review." CVPIA § 3404(c)(1). And subsection (2) simply incorporates "requirements imposed by existing law." *Id.* § 3404(c)(2). Neither subsection mandates any particular level of environmental review under NEPA nor expressly requires Section 7 consultation.

Instead, they refer to obligations under "applicable" and "existing" law. As explained *supra*, Reclamation's contract conversion under WIIN Act is a nondiscretionary act that does not trigger obligations for environmental review or consultation under the ordinary operation of NEPA and the ESA.[13]

Because the CVPIA does not mandate NEPA review or Section 7 consultation for contract conversions under WIIN Act Section 4011, section 4012(a)(2)'s savings clause does not incorporate any such requirements either.

### 2. Sections 4012(a)(3) and (4)

For similar reasons, Plaintiffs' reliance on the savings clauses in WIIN Act Sections 4012(a)(3) and (4) also fails. Those sections provide that the Act "shall not be interpreted or implemented in a manner that":

> (3) overrides, modifies, or amends the applicability of the Endangered Species Act of 1973 (16 U.S.C. 1531 et seq.) or the application of the smelt and salmonid biological opinions to

---

[13] Reclamation complied with the requirement referenced in subsection (c)(1) concerning "the preparation of the environmental impact statement required in section 3409 of this title" in 1999 when it completed the Central Valley Project Improvement Act Final Programmatic Environmental Impact Statement. Order at 11 (citing *Pac. Coast Fed'n of Fishermen's Assoc. v. U.S. Dep't of the Interior*, 929 F. Supp. 2d 1039, 1043 (E.D. Cal. 2013)).

the operation of the Central Valley Project or the State Water Project; or

(4) would cause additional adverse effects on listed fish species beyond the range of effects anticipated to occur to the listed fish species for the duration of the applicable biological opinion, using the best scientific and commercial data available.

WIIN Act § 4012(a)(3)-(4). Plaintiffs claim that these provisions require ESA consultation for contract conversions. That is wrong for at least three reasons. First, section (a)(3) expressly relates to "the operation of the Central Valley Project," not to contract conversions, as the district court rightly observed, 1-ER-057. Reclamation has repeatedly done NEPA review and reinitiated Section 7 consultation for the Project's operations, most recently in the programmatic environmental impact statement and biological opinions adopted in 2024. *See supra* at 18.

Second, Section 4012(a)(3) prohibits interpretation of the WIIN Act that would "override[], modif[y], or amend[] the applicability of the [ESA]." WIIN Act § 4012(a)(3). As explained above, the ESA Section 7 consultation obligations simply do not apply to non-discretionary agency actions. Thus, no modification or amendment to the ESA's application is needed for this Court to conclude that the consultation obligation did not apply here.

54

Third, Section 4012(a)(4) merely maintained the operational status quo set by existing biological opinions. The contracts converted under Section 4011 of the WIIN Act did not disturb that operational status quo; instead, they modified the financial terms for repayment. Indeed, § 4011(a)(4)(C) prohibited changes to water service rights that could have departed from the status quo. WIIN Act § 4012(a)(4). Nothing in section 4012(a)'s ESA savings clauses mandates consultation here.

### 3. Section 4011(d)(4)

Finally, Plaintiffs point to section 4011(d)(4) of the WIIN Act, which prohibits implementation of Section 4011 from altering, "except as expressly provided in this section, any obligations under the reclamation law . . . ." WIIN Act § 4011(d)(4). According to Plaintiffs, that provision "encompasses Reclamation's obligations under the CVPIA." Pls.' Br. 52. But as explained above, the CVPIA does not require NEPA review or Section 7 consultation for the WIIN Act contract conversions at issue here. WIIN Act section 4011(d)(4) therefore does not change the analysis.

### E. Plaintiffs' citation to the WIIN Act signing statement is also unavailing.

Unable to show that the substantive text of the WIIN Act confers on Reclamation a discretionary duty to undertake NEPA review and ESA

55

consultation, Plaintiffs resort to citing the President's signing statement. Pls.' Br. 40-41.

That argument is unpersuasive and was rightly rejected by the district court. As an initial matter, presidential signing statements shed little light on legislative intent. *See Yakima Valley Mem'l Hosp. v. Washington State Dep't of Health*, 654 F.3d 919, 934 (9th Cir. 2011) (casting doubt on whether "a presidential signing statement could establish an unmistakably clear *legislative* intent"). And Plaintiffs cite no case adopting (much less deferring to) a presidential signing statement as an agency's interpretation of a statute.

But even setting that aside, the district court reviewed the statement in context and found that it relates to Project operations, not contracting. 1-ER-062-063. The statement says, in pertinent part:

> Title III, Subtitle J, also includes *short term provisions governing operations of the federal and state water projects* under the Endangered Species Act for up to five years, regardless of drought condition. Building on the work of previous Administrations, my Administration has worked closely with the State of California and other affected parties to address the critical elements of California's complex water challenges by accommodating the needs and concerns of California water users and the important species that depend on that same water. . . . I interpret and understand Subtitle J to require continued application and implementation of the Endangered Species Act, consistent with the close and

56

cooperative work of federal agencies with the State of California to assure that state water quality standards are met. This reading *of the short-term operational provisions* carries out the letter and spirit of the law . . . .

Statement on Signing the [WIIN] Act, 2016 Daily Comp. Pres. Doc. 12 (Dec. 16, 2016) (emphasis added).

The statement repeatedly clarifies that it is discussing the "short term provisions governing operations" contained in other sections of the WIIN Act, and it does not discuss the contract conversions governed by § 4011. Despite that plain language and the district court's conclusion that the signing statement relates to project operations and not to contract conversions, Plaintiffs do not address the context related to Project operations. Pls.' Br. 40. Instead, they selectively quote the statement, omitting the first sentence above and beginning with the second sentence instead. *Id.* ("Building on the work . . ."). And Plaintiffs offer no response to the district court's conclusion that the statement appears focused on "'short term operational provisions of the WIIN Act'" and thus has "little bearing on the interpretive question presented in this case." 1-ER-063. And, as explained above, Reclamation is continuing to apply and implement the ESA for Central Valley Project operations. *See supra* at 16-18. Plaintiffs' reliance on the signing statement fails.

57

## II. Plaintiffs' reliance on the canon against implied repeals is misplaced.

Plaintiffs claim that Reclamation's position "amounts to claiming that the WIIN Act somehow impliedly repealed the requirements set forth in [NEPA, the ESA, and the CVPIA.]." Pls.' Br. 33. That is incorrect.

Plaintiffs' arguments about implied repeals are a red herring that responds to an argument Reclamation never made. Reclamation has never argued that the WIIN Act impliedly repealed NEPA, the ESA, or the CVPIA. And no such conclusion is necessary to find for Reclamation here.

To the contrary, Reclamation's interpretation of the WIIN Act, which the district court largely adopted, relies solely on the ordinary operation of NEPA and the ESA. NEPA's statutory text and the precedent interpreting NEPA make clear that agencies do not need to prepare environmental reports for mandatory, nondiscretionary acts. 42 U.S.C. § 4336e(10)(B)(vii); *id.* § 4336e(12); *id.* § 4336(a)(4). Consultation under Section 7 of the ESA likewise is not required for a nondiscretionary action. 50 C.F.R. § 402.03; *Home Builders*, 551 U.S. at 666. The question for this Court is thus whether Section 4011 of the WIIN Act imposed a mandatory, nondiscretionary duty or whether it conferred discretion on

58

Reclamation sufficient to trigger environmental review and consultation obligations. If it imposed a nondiscretionary duty, NEPA's review requirement and Section 7's consultation obligations simply are not triggered, and the statutes do not apply; it has nothing to do with repealing them.[14]

The district court recognized this, concluding that "the Ninth Circuit's reasoning regarding repeals by implication does not directly apply to the ESA claims in this case," which are instead governed by *Home Builders* and this Court's cases applying that precedent. 1-ER-023. The court correctly observed that "[a] long line of Ninth Circuit cases has interpreted the scope of [ESA regulation limiting Section 7's scope to discretionary acts] without adding on a layer of additional analysis from the 'repeal by implication' caselaw." 1-ER-070.

---

[14] For similar reasons, Plaintiffs' arguments concerning the WIIN Act's headings, Pls.' Br. 43-45, also miss the mark. Plaintiffs observe that the headings do not expressly prohibit ESA consultation or NEPA review, and that the heading of § 4011(d) disclaims any effect on existing law. *Id.* at 44. But as explained above, neither ESA consultation nor NEPA review were required here under the ordinary operation of those statutes. Thus, no repeal or "elimination of ESA and NEPA review" was required because Reclamation's implementation of WIIN Act Section 4011 simply did not trigger an obligation to consult under the ESA or undertake NEPA review.

*Home Builders* confirms this approach. In affirming the regulation limiting Section 7 to discretionary acts, *Home Builders* found that the regulation harmonized Section 7 with statutes that impose mandatory obligations in a way that complies with the canon against implied repeals. 551 U.S. at 669 (regulation "not only is reasonable, inasmuch as it gives effect to the ESA's provision, but also comports with the canon against implied repeals because it stays § 7(a)(2)'s mandate where it would effectively override otherwise mandatory statutory duties"). Likewise here, Reclamation's conclusion that NEPA and the ESA do not apply to the conversion of contracts under the WIIN Act harmonizes NEPA and ESA with the WIIN Act's prohibition on changing the contractors' terms of water service.

Thus, the canon against implied repeals is not pertinent to Plaintiffs' claims. Those claims turn instead on how the ordinary standards of NEPA and the ESA apply given the WIIN Act's statutory text. As explained above, that text does not confer Reclamation with discretion in converting the water service contracts.

60

### III. Plaintiffs' arguments based on the prior water service contracts fail.

Plaintiffs attempt to rely on three provisions that appeared in the prior contracts but were removed or were edited in the converted contracts. Pls.' Br. 23-31. Reclamation made these limited changes to reflect that these prepayment contracts are for an indefinite, rather than a definite, term, and to reflect that the contracts continue to be governed by the ESA obligations existent under the current status quo.

According to Plaintiffs, the prior contracts imposed contractual obligations on Reclamation to undertake Section 7 consultation and NEPA review, and Reclamation's omission of those provisions in the converted contracts can (and did) modify substantive terms of the contract notwithstanding WIIN Act Section 4011(a)(4)(c). Plaintiffs also claim the provisions demonstrate that, because Reclamation had a preexisting obligation to consult under the ESA and undertake environmental review under NEPA, it retained discretion to also do so when converting the contract. Plaintiffs are wrong on both points, and the district court rightly rejected these arguments.

Plaintiffs identify three terms of the prior contracts that, in their view, contractually obligated Reclamation to undertake Section 7

61

consultation and NEPA review. None of these provisions include any such obligation. First, Plaintiffs point to former Article 3(e), which stated:

> The Contractor shall comply with requirements applicable to the Contractor in biological opinion(s) prepared as result of a consultation regarding the execution of this Contract undertaken pursuant to Section 7 of the Endangered Species Act of 1973 (ESA), as amended, that are within the Contractor's legal authority to implement.

2-ER-256.

> The converted contract modified that language, stating:

> The Contractor shall comply with requirements applicable to the Contractor in biological opinion(s) prepared as a result of a consultation regarding the execution of any water service contract between the Contracting Officer and the Contractor in effect immediately prior to the Effective Date of this Contract undertaken pursuant to Section 7 of the Endangered Species Act of 1973 (ESA), as amended, that are within the Contractor's legal authority to implement.

2-ER-170.

Plaintiffs contend that the prior contract required "pre-contract execution ESA review," and that the alteration of that language in the converted contract was a material change that eliminated a consultation requirement. But that interpretation is contradicted by the text of the contracts themselves.

62

In requiring the contractor to "comply with requirements applicable to the Contractor in biological opinion(s)," the prior contract bound the contractor to follow terms and conditions from the biological opinion. It did not impose any obligation on Reclamation at all. And it applied to consultation undertaken in connection with "the execution of *this* Contract," i.e., the prior term-limited contract. 2-ER-256 (emphasis added). At most, the prior contract contemplated that consultation likely would occur prior to execution of that long-term contract. But it did not impose any standalone obligation requiring Reclamation to consult.

Article 3(e) of the converted contract does not remove the contractor's obligation to comply with applicable conditions imposed on it by Section 7 consultation. Instead, it preserves that obligation by requiring the contractor to continue to be bound by biological opinions completed in connection with execution of the prior term contract: *i.e.*, it did not modify any terms regarding compliance with the ESA but rather maintained the existing compliance requirements. And it reasonably omitted the language concerning "consultation regarding the execution of *this Contract*" because Reclamation had concluded that contract conversion under the WIIN Act did not require ESA consultation.

63

In arguing to the contrary, Plaintiffs point to this Court's recent decision in *NRDC v. Haaland*, 102 F.4th 1045, which construed a similar contract provision to the one Plaintiffs rely on here. Pls.' Br. 27-29. But, again, Plaintiffs misread that case, which actually supports the reading adopted by the district court. *Haaland* construed the following language:

> The Contractor shall comply with requirements applicable to the Contractor in biological opinion(s) prepared as a result of a consultation regarding the execution of this Settlement Contract undertaken pursuant to Section 7 of the Endangered Species Act of 1973, as amended, that are within the Contractor's legal authority to implement.

102 F.4th at 1075. As the Court explained, that contact term "establishes the Sacramento River Contractors' legal obligation to comply with a biological opinion issued with respect to 'the execution of the renewal of *this* Settlement Contract,' meaning the very Settlement Contract that the Contractor is signing." *Id.* It "d[id] not apply to any consultation other than one regarding the execution of the particular Settlement Contract in which it appears." *Id.* And, "[b]y its terms, this language applies only to the Sacramento River Contractors." *Id.* It "gives no authority to Reclamation." *Id.* Thus, "nothing in the language of [the relevant article] gives Reclamation discretion to deviate from the Contract's language and

64

implement measures that inure to the benefit of the Chinook salmon in the event of future biological opinions." *Id.*

Thus, *Haaland* rejected the plaintiffs' attempt to use that contract provision to impose ongoing consultation obligations on Reclamation. It reached that conclusion because the relevant provision only imposed an obligation on the contractor; it did not confer discretion (much less an obligation) on Reclamation to undertake further consultation. And it applied only to execution of the relevant term contract itself. *Haaland* thus confirms Reclamation's reading, adopted by the district court here. Nothing in article 3(e) of the prior contract required ESA consultation, and particularly not as to contract conversions under Section 4011 of the WIIN Act.

The same is true of Articles 2(a) and 2(b) of the previous contracts. Article 2(a) stated:

> Except as provided in subdivision (b) of this Article, *until completion of all appropriate environmental review*, and provided that the Contractor has complied with all the terms and conditions of the interim renewal contract in effect for the period immediately preceding the requested successive interim renewal contract, this Contract will be renewed, upon request of the Contractor, for successive interim periods each of which shall be no more than two (2) Years in length.

2-ER-251. Article 2(b) further addressed limits on the contract terms, providing that contracts could only be renewed on an interim basis if "all environmental documentation required to allow execution of the Contractor's long-term renewal contract by both parties has not been completed." 2-ER-252.

Like Article 3(e), these provisions do not impose any obligation on Reclamation to undertake NEPA review. Instead, they merely limited the term of the contract that Reclamation could enter into until it had completed "all appropriate environmental review." 2-ER-251. Thus, the terms cannot apply to conversions under WIIN Act, because that Act *required* Reclamation to convert a repayment contract to termless prepayment contract upon request of the contractor. Reclamation certainly could not have complied with that provision by entering short-term contracts while preparing an environmental report under NEPA. And there was no need to undertake further NEPA review for the contract conversions because Reclamation lacked any discretion to choose not to convert the contract. Reclamation thus reasonably omitted those terms from the converted contracts. Nothing in the language of the

66

converted contracts should alter this Court's analysis of the WIIN Act's statutory text.

*　　*　　*

In enacting the WIIN Act, Congress imposed a mandatory obligation on Reclamation to convert water service contracts to repayment contracts upon request of the contractor. That duty was nondiscretionary and therefore did not trigger any obligation that Reclamation prepare an environmental report under NEPA or consult under Section 7 of the ESA. Plaintiffs offer no plausible reading of the WIIN Act that could support a contrary finding. And their arguments that rely on sources outside the WIIN Act fail as well.[15]

## CONCLUSION

For all these reasons, this Court should affirm the district court's judgment.

---

[15] This Court should affirm. But if the Court disagrees with Reclamation and the district court, it should remand to the district court to consider remedy. *350 Montana v. Haaland*, 50 F.4th 1254, 1273 (9th Cir. 2022); *see also* 1-ER-071 (declining to "address the remedies arguments raised in the papers").

Respectfully submitted,

/s/ *Angela N. Ellis*
ADAM R.F. GUSTAFSON
*Principal Deputy Assistant Attorney General*

ROBERT P. STOCKMAN
DAVID W. GEHLERT
JEFFREY N. CANDRIAN
ANGELA N. ELLIS
*Attorneys*
Environment and Natural Resources
Division
U.S. Department of Justice
Post Office Box 7415
Washington, D.C. 20044
(202) 598-7942
angela.ellis@usdoj.gov

January 23, 2026
90-1-4-16048

68

### Form 8.  Certificate of Compliance for Briefs

**9th Cir. Case Number(s) 25-5137**

I am the attorney or self-represented party.

**This brief contains 12,907 words,** excluding the items exempted by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[X] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
  [ ] it is a joint brief submitted by separately represented parties;
  [ ] a party or parties are filing a single brief in response to multiple briefs; or
  [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature**  *s/ Angela N. Ellis*
**Date**  January 23, 2026

# ADDENDUM

42 U.S.C. § 4336...................................................................................... 1a

42 U.S.C. § 4336e.................................................................................... 2a

50 C.F.R. § 402.03................................................................................... 4a

ment note under section 5313 of Title 5, Government Organization and Employees.

### § 4333. Conformity of administrative procedures to national environmental policy

All agencies of the Federal Government shall review their present statutory authority, administrative regulations, and current policies and procedures for the purpose of determining whether there are any deficiencies or inconsistencies therein which prohibit full compliance with the purposes and provisions of this chapter and shall propose to the President not later than July 1, 1971, such measures as may be necessary to bring their authority and policies into conformity with the intent, purposes, and procedures set forth in this chapter.

(Pub. L. 91–190, title I, §103, Jan. 1, 1970, 83 Stat. 854.)

### § 4334. Other statutory obligations of agencies

Nothing in section 4332 or 4333 of this title shall in any way affect the specific statutory obligations of any Federal agency (1) to comply with criteria or standards of environmental quality, (2) to coordinate or consult with any other Federal or State agency, or (3) to act, or refrain from acting contingent upon the recommendations or certification of any other Federal or State agency.

(Pub. L. 91–190, title I, §104, Jan. 1, 1970, 83 Stat. 854.)

### § 4335. Efforts supplemental to existing authorizations

The policies and goals set forth in this chapter are supplementary to those set forth in existing authorizations of Federal agencies.

(Pub. L. 91–190, title I, §105, Jan. 1, 1970, 83 Stat. 854.)

### § 4336. Procedure for determination of level of review

**(a) Threshold determinations**

An agency is not required to prepare an environmental document with respect to a proposed agency action if—

(1) the proposed agency action is not a final agency action within the meaning of such term in chapter 5 of title 5;

(2) the proposed agency action is excluded pursuant to one of the agency's categorical exclusions, another agency's categorical exclusions consistent with section 4336c of this title, or another provision of law;

(3) the preparation of such document would clearly and fundamentally conflict with the requirements of another provision of law; or

(4) the proposed agency action is a nondiscretionary action with respect to which such agency does not have authority to take environmental factors into consideration in determining whether to take the proposed action.

**(b) Levels of review**

**(1) Environmental impact statement**

An agency shall issue an environmental impact statement with respect to a proposed agency action requiring an environmental document that has a reasonably foreseeable significant effect on the quality of the human environment.

**(2) Environmental assessment**

An agency shall prepare an environmental assessment with respect to a proposed agency action that does not have a reasonably foreseeable significant effect on the quality of the human environment, or if the significance of such effect is unknown, unless the agency finds that the proposed agency action is excluded pursuant to one of the agency's categorical exclusions, another agency's categorical exclusions consistent with section 4336c of this title, or another provision of law. Such environmental assessment shall be a concise public document prepared by a Federal agency to set forth the basis of such agency's finding of no significant impact or determination that an environmental impact statement is necessary.

**(3) Sources of information**

In making a determination under this subsection, an agency—

(A) may make use of any reliable data source; and

(B) is not required to undertake new scientific or technical research unless the new scientific or technical research is essential to a reasoned choice among alternatives, and the overall costs and time frame of obtaining it are not unreasonable.

(Pub. L. 91–190, title I, §106, as added Pub. L. 118–5, div. C, title III, §321(b), June 3, 2023, 137 Stat. 39.)

### § 4336a. Timely and unified Federal reviews

**(a) Lead agency**

**(1) Designation**

**(A) In general**

If there are two or more participating Federal agencies, such agencies shall determine, by letter or memorandum, which agency shall be the lead agency based on consideration of the—

(i) magnitude of agency's involvement;

(ii) project approval or disapproval authority;

(iii) expertise concerning the action's environmental effects;

(iv) duration of agency's involvement; and

(v) sequence of agency's involvement.

**(B) Joint lead agencies**

In making a determination under subparagraph (A), the participating Federal agencies may appoint such State, Tribal, or local agencies as joint lead agencies as the involved Federal agencies shall determine appropriate. Joint lead agencies shall jointly fulfill the role described in paragraph (2).

**(2) Role**

A lead agency shall, with respect to a proposed agency action—

(A) supervise the preparation of an environmental document if, with respect to such

1a

§ 4336d                TITLE 42—THE PUBLIC HEALTH AND WELFARE                Page 6088

proposed adoption of the categorical exclusion to a category of actions is appropriate;

(3) identify to the public the categorical exclusion that the agency plans to use for its proposed actions; and

(4) document adoption of the categorical exclusion.

(Pub. L. 91–190, title I, §109, as added Pub. L. 118–5, div. C, title III, §321(b), June 3, 2023, 137 Stat. 43.)

### § 4336d. E-NEPA

#### (a) Permitting portal study

The Council on Environmental Quality shall conduct a study and submit a report to Congress within 1 year of the enactment of this Act[1] on the potential for online and digital technologies to address delays in reviews and improve public accessibility and transparency under section 4332(2)(C) of this title including, but not limited to, a unified permitting portal that would—

(1) allow applicants to—

(A) submit required documents or materials for their project in one unified portal;

(B) upload and collaborate with the applicable agencies to edit documents in real-time, as required;

(C) upload and display visual features such as video, animation, geographic information system displays, and three-dimensional renderings; and

(D) track the progress of individual applications;

(2) include a cloud based, digital tool for more complex reviews that would enhance interagency coordination in consultation by—

(A) centralizing, across all necessary agencies, the data, visuals, and documents, including but not limited to geographic information system displays, other visual renderings, and completed reports and analyses necessary for reviews;

(B) streamlining communications between all necessary agencies and the applicant;

(C) allowing for comments and responses by and to all necessary agencies in one unified portal;

(D) generating analytical reports to aid in organizing and cataloguing public comments; and

(E) be[2] accessible on mobile devices;

(3) boost transparency in agency processes and present information suitable for a lay audience, including but not limited to—

(A) scientific data and analysis; and

(B) anticipated agency process and timeline; and

(4) include examples describing how at least five permits would be reviewed and processed through this portal.

#### (b) Authorization of appropriations

There is authorized to be appropriated $500,000 for the Council on Environmental Quality to carry out the study directed by this section.

(Pub. L. 91–190, title I, §110, as added Pub. L. 118–5, div. C, title III, §321(b), June 3, 2023, 137 Stat. 44.)

---

[1] See References in Text note below.

[2] So in original. Probably should be ''being''.

### Editorial Notes

#### REFERENCES IN TEXT

The enactment of this Act, referred to in subsec. (a), probably means the enactment of Pub. L. 118–5, which added this section to title I of Pub. L. 91–190 and was approved June 3, 2023.

### § 4336e. Definitions

In this subchapter:

#### (1) Categorical exclusion

The term ''categorical exclusion'' means a category of actions that a Federal agency has determined normally does not significantly affect the quality of the human environment within the meaning of section 4332(2)(C) of this title.

#### (2) Cooperating agency

The term ''cooperating agency'' means any Federal, State, Tribal, or local agency that has been designated as a cooperating agency under section 4336a(a)(3) of this title.

#### (3) Council

The term ''Council'' means the Council on Environmental Quality established in subchapter II.

#### (4) Environmental assessment

The term ''environmental assessment'' means an environmental assessment prepared under section 4336(b)(2) of this title.

#### (5) Environmental document

The term ''environmental document'' means an environmental impact statement, an environmental assessment, or a finding of no significant impact.

#### (6) Environmental impact statement

The term ''environmental impact statement'' means a detailed written statement that is required by section 4332(2)(C) of this title.

#### (7) Finding of no significant impact

The term ''finding of no significant impact'' means a determination by a Federal agency that a proposed agency action does not require the issuance of an environmental impact statement.

#### (8) Participating Federal agency

The term ''participating Federal agency'' means a Federal agency participating in an environmental review or authorization of an action.

#### (9) Lead agency

The term ''lead agency'' means, with respect to a proposed agency action—

(A) the agency that proposed such action; or

(B) if there are 2 or more involved Federal agencies with respect to such action, the agency designated under section 4336a(a)(1) of this title.

#### (10) Major Federal action

##### (A) In general

The term ''major Federal action'' means an action that the agency carrying out such

2a

action determines is subject to substantial Federal control and responsibility.

**(B) Exclusion**

The term ''major Federal action'' does not include—

(i) a non-Federal action—

(I) with no or minimal Federal funding; or

(II) with no or minimal Federal involvement where a Federal agency cannot control the outcome of the project;

(ii) funding assistance solely in the form of general revenue sharing funds which do not provide Federal agency compliance or enforcement responsibility over the subsequent use of such funds;

(iii) loans, loan guarantees, or other forms of financial assistance where a Federal agency does not exercise sufficient control and responsibility over the subsequent use of such financial assistance or the effect of the action;

(iv) business loan guarantees provided by the Small Business Administration pursuant to section 7(a) or (b) and[1] of the Small Business Act ( U.S.C. 636(a)),[2] or title V of the Small Business Investment Act of 1958 (15 U.S.C. 695 et seq.);

(v) bringing judicial or administrative civil or criminal enforcement actions;

(vi) extraterritorial activities or decisions, which means agency activities or decisions with effects located entirely outside of the jurisdiction of the United States; or

(vii) activities or decisions that are nondiscretionary and made in accordance with the agency's statutory authority.

**(11) Programmatic environmental document**

The term ''programmatic environmental document'' means an environmental impact statement or environmental assessment analyzing all or some of the environmental effects of a policy, program, plan, or group of related actions.

**(12) Proposal**

The term ''proposal'' means a proposed action at a stage when an agency has a goal, is actively preparing to make a decision on one or more alternative means of accomplishing that goal, and can meaningfully evaluate its effects.

**(13) Special expertise**

The term ''special expertise'' means statutory responsibility, agency mission, or related program experience.

(Pub. L. 91–190, title I, §111, as added Pub. L. 118–5, div. C, title III, §321(b), June 3, 2023, 137 Stat. 44.)

### Editorial Notes

REFERENCES IN TEXT

The Small Business Investment Act of 1958, referred to in par. (10)(B)(iv), is Pub. L. 85–699, Aug. 21, 1958, 72

---

[1] So in original. The word ''and'' probably should not appear.
[2] So in original. Probably should refer to 15 U.S.C. 636(a), (b).

Stat. 689. Title V of the Act is classified generally to subchapter V (§695 et seq.) of chapter 14B of Title 15, Commerce and Trade. For complete classification of this Act to the Code, see Short Title note set out under section 661 of Title 15 and Tables.

### SUBCHAPTER II—COUNCIL ON ENVIRONMENTAL QUALITY

### § 4341. Omitted

### Editorial Notes

CODIFICATION

Section, Pub. L. 91–190, title II, §201, Jan. 1, 1970, 83 Stat. 854, which required the President to transmit to Congress annually an Environmental Quality Report, terminated, effective May 15, 2000, pursuant to section 3003 of Pub. L. 104–66, as amended, set out as a note under section 1113 of Title 31, Money and Finance. See, also, item 1 on page 41 of House Document No. 103–7.

### § 4342. Establishment; membership; Chairman; appointments

There is created in the Executive Office of the President a Council on Environmental Quality (hereinafter referred to as the ''Council''). The Council shall be composed of three members who shall be appointed by the President to serve at his pleasure, by and with the advice and consent of the Senate. The President shall designate one of the members of the Council to serve as Chairman. Each member shall be a person who, as a result of his training, experience, and attainments, is exceptionally well qualified to analyze and interpret environmental trends and information of all kinds; to appraise programs and activities of the Federal Government in the light of the policy set forth in subchapter I of this chapter; to be conscious of and responsive to the scientific, economic, social, esthetic, and cultural needs and interests of the Nation; and to formulate and recommend national policies to promote the improvement of the quality of the environment.

(Pub. L. 91–190, title II, §202, Jan. 1, 1970, 83 Stat. 854.)

### Statutory Notes and Related Subsidiaries

COUNCIL ON ENVIRONMENTAL QUALITY; REDUCTION OF MEMBERS

Provisions stating that notwithstanding this section, the Council was to consist of one member, appointed by the President, by and with the advice and consent of the Senate, serving as chairman and exercising all powers, functions, and duties of the Council, were contained in the Department of the Interior, Environment, and Related Agencies Appropriations Act, 2006, Pub. L. 109–54, title III, Aug. 2, 2005, 119 Stat. 543, and were repeated in provisions of subsequent appropriations acts which are not set out in the Code. Similar provisions were also contained in the following prior appropriations acts:

Pub. L. 108–447, div. I, title III, Dec. 8, 2004, 118 Stat. 3332.

Pub. L. 108–199, div. G, title III, Jan. 23, 2004, 118 Stat. 408.

Pub. L. 108–7, div. K, title III, Feb. 20, 2003, 117 Stat. 514.

Pub. L. 107–73, title III, Nov. 26, 2001, 115 Stat. 686.

Pub. L. 106–377, §1(a)(1) [title III], Oct. 27, 2000, 114 Stat. 1441, 1441A–45.

Pub. L. 106–74, title III, Oct. 20, 1999, 113 Stat. 1084.

Pub. L. 105–276, title III, Oct. 21, 1998, 112 Stat. 2500.

**FWS, DOI, and NOAA, Commerce** § 402.04

*Incidental take* refers to takings that result from, but are not the purpose of, carrying out an otherwise lawful activity conducted by the Federal agency or applicant.

*Informal consultation* is an optional process that includes all discussions, correspondence, etc., between the Service and the Federal agency or the designated non-Federal representative prior to formal consultation, if required.

*Jeopardize the continued existence of* means to engage in an action that reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species.

*Listed species* means any species of fish, wildlife, or plant which has been determined to be endangered or threatened under section 4 of the Act. Listed species are found in 50 CFR 17.11–17.12.

*Major construction activity* is a construction project (or other undertaking having similar physical impacts) which is a major Federal action significantly affecting the quality of the human environment as referred to in the National Environmental Policy Act [NEPA, 42 U.S.C. 4332(2)(C)].

*Mixed programmatic action* means, for purposes of an incidental take statement, a Federal action that approves action(s) that will not be subject to further section 7 consultation, and also approves a framework for the development of future action(s) that are authorized, funded, or carried out at a later time and any take of a listed species would not occur unless and until those future action(s) are authorized, funded, or carried out and subject to further section 7 consultation.

*Preliminary biological opinion* refers to an opinion issued as a result of early consultation.

*Programmatic consultation* is a consultation addressing an agency's multiple actions on a program, region, or other basis. Programmatic consultations allow the Services to consult on the effects of programmatic actions such as:

(1) Multiple similar, frequently occurring, or routine actions expected to be implemented in particular geographic areas; and

(2) A proposed program, plan, policy, or regulation providing a framework for future proposed actions.

*Proposed critical habitat* means habitat proposed in the FEDERAL REGISTER to be designated or revised as critical habitat under section 4 of the Act for any listed or proposed species.

*Proposed species* means any species of fish, wildlife, or plant that is proposed in the FEDERAL REGISTER to be listed under section 4 of the Act.

*Reasonable and prudent alternatives* refer to alternative actions identified during formal consultation that can be implemented in a manner consistent with the intended purpose of the action, that can be implemented consistent with the scope of the Federal agency's legal authority and jurisdiction, that is economically and technologically feasible, and that the Director believes would avoid the likelihood of jeopardizing the continued existence of listed species or resulting in the destruction or adverse modification of critical habitat.

*Reasonable and prudent measures* refer to those actions the Director considers necessary or appropriate to minimize the impact of the incidental take on the species.

*Recovery* means improvement in the status of listed species to the point at which listing is no longer appropriate under the criteria set out in section 4(a)(1) of the Act.

*Service* means the U.S. Fish and Wildlife Service or the National Marine Fisheries Service, as appropriate.

[51 FR 19957, June 3, 1986, as amended at 73 FR 76286, Dec. 16, 2008; 74 FR 20422, May 4, 2009; 80 FR 26844, May 11, 2015; 81 FR 7225, Feb. 11, 2016; 84 FR 45016, Aug. 27, 2019; 89 FR 24297, Apr. 5, 2024]

**§ 402.03  Applicability.**

Section 7 and the requirements of this part apply to all actions in which there is discretionary Federal involvement or control.

[74 FR 20423, May 4, 2009]

**§ 402.04  Counterpart regulations.**

The consultation procedures set forth in this part may be superseded for a particular Federal agency by joint

369

4a